GODDARD (SALMON FALLS MANUF'G CO. v.).   See Case No. 12,263.

GODDARD (STEIN v.).   See Case No. 13,353.

## Case No. 5,494.

### GODDARD et al. v. The TANGIER.

[Brunner, Col. Cas. 602;[1] 21 Law Rep. 12.]

Circuit Court, D. Massachusetts.   1857.[2]

#### AGENCY—AUTHORITY OF AGENT.

A clerk as such has no authority to bind his employer by an agreement to receive goods from a carrier at an unusual time; nor has a truckman such authority.

[Appeal from the district court of the United States for the district of Massachusetts.

1 [Reported by Albert Brunner, Esq., and here reprinted by permission.]
2 [Reversed in 23 How. (64 U. S.) 28.]

[This was a suit in admiralty by David Goddard, John H. Pearson, and others against the bark Tangier (Charles Richardson and others, claimants). The district court dismissed the libel (case unreported), and the libelants appealed to this court.]

C. B. Goodrich and C. P. Curtis, Jr., for libelants.

R. Choate and J. M. Bell, for claimants.

CURTIS, Circuit Justice. This libel is founded on a bill of lading of cotton, brought by the Tangier, and destroyed at the same time as that of the Salmon Falls Company. The circumstances relied on to distinguish this case from the last [Salmon Falls Manuf'g Co. v. The Tangier, Case No. 12,265] are, that the mate of the bark testifies that, on Wednesday, he informed Solis, a clerk of the libelants, who had charge of receiving and taking away their cotton, that the stevedore would work on Thursday; and that Solis replied, if the stevedore worked, he should. Solis admits that something like this was said, but that he qualified it by saying he would work if the men were willing to do so, and Mr. Appleton would open the store into which they were putting the cotton. He also testifies that he subsequently told the mate he should not take cotton the next day, because Mr. Appleton would not open his store.

Assuming that both the witnesses intend to tell the truth, and that each has related what rests on his memory, and I see no cause to doubt the honesty of either of them, the fair result of the evidence is, that at one time Solis led the mate to expect he would work on the fast-day, but afterwards informed him he should not. And this is confirmed by the evidence of McDonald, who says the mate told him, on Thursday morning, Solis would not be down that day. McDonough says he heard this said by the mate; and Clifford says he heard Solis tell the mate he should not work on Thursday. The master also testifies: "I told Solis, in the course of conversation, on Wednesday, that he should work on fast-day; he said they would take it all away; that they had plenty of stores then." He also testifies that when he applied to Mr. Goddard, on Wednesday, to hasten the removal of the cotton, Goddard referred him to Solis, as having charge of the removal. It is material to observe that neither the master nor the mate say that they were influenced in their action by what Solis said. On the contrary, each informed him, before he had said anything on the subject, that the work would proceed on the fast-day. Still it is competent for a consignee to agree to receive goods at an unusual time, when he is not bound to receive them; and if he should so agree, and they should be made ready for delivery at the agreed time, I think the liability of the carrier would be terminated. But there is no evidence that the libelants themselves agreed to receive their goods on the

fast-day; and I do not find proof of authority in Solis to make such an agreement for them. All that appears is, that he had charge, as a clerk, of the receipt of the cotton. This must be understood to be an authority to receive it in the usual course of such business. He had no power to bind his employers by an agreement to depart from the usual course of business, and put the cotton at their risk at a time and under circumstances when it would in the usual course of business have remained at the risk of the carrier. Suppose he had agreed to receive it in the night-time, or on Sunday, would this have affected his principals? And he had no better authority to agree to receive it at one unusual time than at another.

Something was said at the argument respecting the fact that a part of the cotton, which was landed on Tuesday, belonged to Goddard & Pritchard, and was burned. But I do not think it appears that any part which was accessible on Wednesday was allowed to remain. On the contrary, it is shown by the libelants that they had ample storage room, and sufficient men and teams employed on Wednesday, to have removed all their cotton; and that the men ceased work between four and five o'clock p. m., because they could find no more of the libelants' cotton on the wharf. If any was there, it was so mixed with other cotton as not to be accessible with reasonable efforts, and consequently was not ready for delivery. In the case of Pearson the alleged agreement of the truckman to truck cotton on Thursday, if proved, of which I have doubt, cannot avail the claimants. A truckman, as such, has no authority to bind a merchant to receive goods at an unusual time. The result is that the decree of the district court must be reversed, and a decree entered for the value of the cotton lost with costs.

[NOTE. Upon complainants' appeal the decree of the circuit court was reversed, Mr. Justice Grier delivering the opinion. It seems that the goods in question were destroyed by fire while lying on the wharf on the afternoon of the Thursday mentioned in the opinion of the circuit court, which was Thanksgiving Day by appointment of the governor of Massachusetts. The learned justice delivering the opinion of the court remarked that the libelants appeared to have had no conscientious scruples in respect to work on that day, as they received goods from other ships and some from this; but the testimony is clear that, however great the liberty may be for those who choose to convert the day into a voluntary holiday for idleness or amusement, it never has been the custom of vessels discharging cargo on the wharves of Boston to cease work on that day. "On the whole, we are of the opinion, that the bark Tangier has made good delivery of her cargo to the consignee's care to the exigency of the bill of lading." 23 How. (64 U. S.) 28.]